# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAYAKAR JOHN,<br><br>     *Plaintiff*,<br><br>     v.<br><br>WAL-MART STORE 2585,[1] WAL-MART<br>STORES EAST, LP,<br><br>     *Defendants*. | No. 3:21-cv-01285 (MPS) |

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jayakar John brings this employment discrimination action against his former employer, Wal-Mart Store No. 2585 and Wal-Mart Stores East, LP ("Wal-Mart").  Wal-Mart moves for summary judgment on John's two remaining claims—hostile work environment under Title VII of the Civil Rights Act of 1964 and negligent hiring, retention, and supervision.  For the reasons set forth below, I deny Wal-Mart's motion for summary judgment.

## I.      BACKGROUND

Before recounting the facts in this case, I must review the basic rules governing what I may accept as a "fact" for purposes of a summary judgment motion.

### A.      Rules for Summary Judgment Submissions

The Local Rules of this Court require each party to present its version of the facts "in an orderly and structured manner that is designed to allow a judge to ascertain what facts are settled and what facts are in dispute."  *Chimney v. Quiros*, 3:21-CV-00321, 2023 WL 2043290, at *1

---

[1] Wal-Mart notes that Wal-Mart Store 2585 is not a legal entity.  ECF No. 79 at 1 n.1.  If Wal-Mart seeks to have Wal-Mart Store 2585 dismissed as a defendant, it may file a motion to dismiss this defendant together with the affidavit of a Wal-Mart officer competent to aver that Wal-Mart Store 2585 is not a legal entity.

(D. Conn. Feb. 16, 2023).  First, the party moving for summary judgment must file an enumerated statement of facts accompanied by specific citations to supporting evidence—the Local Rule 56(a)1 Statement—along with the cited admissible evidence supporting each individual statement of fact.  *See* D. Conn. L. Civ. R. 56(a)1, 3.  Then, the party opposing summary judgment must submit a responsive statement—the Local Rule 56(a)2 Statement— containing separately numbered paragraphs corresponding to the paragraphs set forth in the moving party's Local Rule 56(a)1 Statement and indicating whether he admits or denies the facts set forth by the moving party in each paragraph.  D. Conn. L. Civ. R. 56(a)2.  Each denial in the Local Rule 56(a)2 Statement must include specific citations to an affidavit or other admissible evidence supporting the statement or denial.  D. Conn. L. Civ. R. 56(a)3.  The non-moving party is also required to submit in a separate section of his Local Rule 56(a)2 Statement entitled "Additional Material Facts" a list of any additional material facts not included in the moving party's Local Rule 56(a)1 Statement that he contends "establish genuine issues of material fact precluding judgment in favor of the moving party."  D. Conn. L. Civ. R. 56(a)2.  These additional facts must also be followed by specific citations to admissible evidence.  D. Conn. L. Civ. R. 56(a)3.

John's Local Rule 56(a)2 Statement fails to comply with several of these requirements. He denies several of Wal-Mart's statements of fact without citing evidence supporting the denial or even explaining the basis for his denial.  *See, e.g.*, ECF No. 93-1 at 6–8 (denying statements concerning Wal-Mart's system of performance evaluation without citing evidence supporting the denial or explaining any basis for it), 26 (denying a statement regarding John's work schedule without citing evidence supporting the denial).  Instead, John follows his denials of Wal-Mart's factual statements with additional facts that often neither contradict nor respond to Wal-Mart's

factual statements.  *See, e.g.*, *id.* at 6–8 (inserting roughly two pages of additional, unrelated facts in response to a statement concerning Wal-Mart's system of performance evaluation), 8–18 (inserting some ten pages of additional facts in response to another of Wal-Mart's factual statements).  In this way, John intersperses his additional facts throughout his responses to Wal-Mart's factual statements, rather than separately listing these facts in a section entitled "Additional Material Facts," as required by the Local Rules.  D. Conn. L. Civ. R. 56(a)2.  Moreover, when John does cite evidence in support of his denials, the evidence is often inadmissible.  For example, John attempts to support many of his contentions by citing his and his co-workers' affidavits, but the affidavits are replete with hearsay statements and unsubstantiated opinions.  *See, e.g.*, ECF No. 93 at 72 (John relying on his own affidavit, which is itself based on the hearsay statement that Market Manager La'Shion Robinson told him that James Rine "had many ethical issues"); *see* ECF No. 93-30 at 3.

Despite these failures to comply with the rules, I have considered John's submissions to the extent they are supported by admissible evidence.  I treat as admitted the properly supported factual statements in Wal-Mart's Local Rule 56(a)1 Statement that are met with denials that John has not properly supported with evidence in the record.  *See* Fed. R. Civ. P. 56(e)(2); D. Conn. L. R. 56(a).  I also consider the properly supported facts gleaned from his submissions.  Where John relies on affidavits that proffer facts that would not be admissible into evidence, I have not considered them.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be

presented in an admissible form at trial."); *Wahad v. Fed. Bureau of Investigation*, 179 F.R.D. 429, 435 (S.D.N.Y. 1998) ("When an affidavit does not comply with these basic requirements, the offending portions should be disregarded by the court.").  With these principles in mind, I treat the following facts as undisputed unless otherwise indicated.

### B.   Factual Allegations

#### 1.   Relevant Parties

Jayakar John, a Black man, began working at Wal-Mart in 2001 as an asset protection, loss prevention associate at the Norwalk, Connecticut location.  ECF No. 81-1 at 3–4.  Two years later, John transferred to Wal-Mart's Stratford, Connecticut location.  *Id.* at 4–5.  He was eventually promoted twice—first to asset protection coordinator and later to assistant manager. *Id.*  In this position, he was responsible for "recovering the store, managing the restocking and cleanliness/presentation of the store."  ECF No. 93-28 at 2.

James Rine, a White man, was the store manager for Wal-Mart's Stratford location during the relevant timeframe.  ECF No. 93-35 at 1.  He transferred from the Wallingford store in late 206 or early 2017.[2]  *See* ECF No. 93-21 at 9, 11; ECF No. 93-22 at 10.  As store manager, Rine was responsible for daily management and operation of the Stratford store, including "taking care of the associate[s] and the customers, driving store operations, driving sales, profit and then driving company programs."  ECF No. 93-21 at 9.  He was also responsible for conducting annual performance evaluations of assistant managers.  *Id.* at 13.

---

[2] When asked when he began working at the Stratford store, Rine testified that it was "around 2017, 2017/2018, I don't have the exact time frame."  ECF No. 93-21 at 9.  He further testified that he "can't exactly recall" whether he began at the store in 2016.  *Id.*  John contends that Rine was transferred to the Stratford store in September 2016. ECF No. 93-26 at 2.  Rine first prepared an annual performance evaluation for John on April 7, 2017.  *See* ECF No. 81-5 at 23–24.  As such, Rine must have begun working at the Stratford store at some point before April 2017.

Lauri Canales[3] was a "market people partner" at Wal-Mart covering the Stratford store during all times relevant to this lawsuit.  ECF No. 93-22 at 6; ECF No. 93-26 at 1 (noting that Canales was responsible for "approximately twelve (12) stores, including Stratford").  In that position, she was responsible for human resources functions, including "hiring . . . oversee[ing] any ethics issues in the store, scheduling issues, handl[ing] wages, benefits, anything HR related."  ECF No. 93-22 at 6.  Her role also included conducting ethics investigations.  *Id.* at 8, 13–14.

Michael Geloso worked as a market asset protection manager over an area including the Stratford store during the relevant timeframe.  ECF No. 93-23 at 26, 57–58.  In this role, he was responsible for security, safety, and inventory control over several Wal-Mart stores.  *Id.* at 29. Twelve asset protection managers in the area reported to him.  *Id.* at 25–26.

Derrick Beasley, a Black man, was an asset protection manager at the Stratford store during the relevant timeframe.  ECF No. 93-32 at 1.  He was responsible for the security of Wal-Mart property at the Stratford location.  *Id.*  He reported to Geloso.  ECF No. 93-23 at 24, 57–58.

Mike Rosa and Mark Sackowicz, both White men, *see* ECF No. 93-34 at 2, transferred from the Wallingford store to the Stratford store as assistant managers shortly after Rine transferred, ECF No. 93-22 at 10; ECF No. 93-21 at 20–21.  Rine worked with Rosa and Sackowicz at the Wallingford store before they all transferred to Stratford.  ECF No. 93-22 at 12.

---

[3] John asserts in his opposition brief that certain Wal-Mart employees are White.  Specifically, he asserts that Lauri Canales and Michael Geloso are White.  *See* ECF No. 93 at 5.  John does not cite any evidence indicating the race of these individuals, and I cannot find any such evidence in the record.  As such, I will not consider these individuals' race.  *See, e.g.*, *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (holding that the nonmoving party may not rely on "conclusory allegations or unsubstantiated speculation").

### 2. Performance Evaluations

Rine completed annual performance evaluations of the store's assistant managers.  ECF No. 93-21 at 13.  Store managers assess assistant managers across three categories: goals, competencies, and diversity and inclusion.  ECF No. 82 at 2; *see, e.g.*, ECF No. 81-5 at 23–24.  In each category, the employee may be rated: (i) below expectations, (ii) development needed, (iii) solid performer, (iv) exceeds expectations, or (v) role model.  ECF No. 82 at 2; *see, e.g.*, ECF No. 81-5 at 2.  The assistant managers' scores in each category are weighed and then combined to calculate an overall rating.  ECF No. 82 at 2; *see, e.g.*, ECF No. 81-5 at 24.

From 2011 to 2016, John received one annual performance rating of development needed, with the rest being solid performer.  ECF No. 81-5 at 2–22.  In 2017, Rine evaluated John for the first time, and gave him an overall rating of development needed.  ECF No. 81-5 at 23–24.  John contends that the co-manager of the Stratford location, Robin Bien-Aime (née Malicki), initially prepared his 2017 evaluation and gave him a rating of solid performer before Rine changed the rating to needs development.  ECF No. 93-1 at 20; ECF No. 93-32 at 3.  Bien-Aime denies that she prepared any 2017 performance evaluations.  ECF No. 81-4 at 3.  Rine again gave John an overall performance rating of development needed in 2018.  ECF No. 81-5 at 25–28.

According to Canales, in 2017, Rine rated all assistant managers at the Stratford store, of whom three were Black (including John) and one was Hispanic, as development needed.  ECF No. 82 at 2.  In 2018, Rine rated three assistant managers, all of whom were Black (including John), as development needed.  *Id.*  In that year, Rine also rated three other assistant managers, one of whom was Black and two of whom were Hispanic, as solid performers, and Rine rated two other assistant managers, one of whom was Black and one of whom was Hispanic, as

"Valued Performance."[4]  *Id.*  In 2019, Rine rated one assistant manager, who was Black, as development needed.  *Id.* at 3.  He rated four other assistant managers, one of whom was Black and three of whom were Hispanic, as solid performers.[5]  *Id.*

### 3.    Cleaning Responsibilities

John contends that Rine instructed him and other Black assistant managers and associates to perform certain cleaning tasks at the Stratford store.  In one incident, John contends that at a managers' meeting Rine instructed him to clean the managers' workstation.  ECF No. 81-1 at 9; ECF No. 93-32 at 7.  According to John, when he explained that the managers' workstation had already been cleaned by an associate, Rine responded by saying "I want you to get on your knees, and I want you to clean it."  ECF No. 81-1 at 10.  The job of cleaning the managers' workstation was customarily done by associates or the maintenance department.  ECF No. 93-32 at 7.  Rine denies demanding John to clean the managers' area on his knees.  ECF No. 93-21 at 37.

Andy Murillo, a support manager, avers that he witnessed Rine instructing Jean Simon, a Black assistant manager, to clean the store's compactor during the winter, a task Murillo never saw delegated to Rosa or Sackowicz.  ECF No. 93-33 at 6.  On another occasion, he avers that he witnessed a Black assistant manager cry after Rine instructed him to clean the area around the registers "on his knees."  *Id.*  In addition, Gabriel Franklin, a Black claim supervisor, avers that Rine asked him and John to clean the "Racquet Ball Room" on "many occasions" from 2017 and 2019.  ECF No. 93-31 at 2.  Franklin "never witnessed [Rine] order any White associates or

---

[4] "Valued Performance" does not appear as one of the five ratings that may be given per Wal-Mart's performance evaluation system, *see id.*; *see also* 81-5 at 2 (performance evaluation form listing the potential ratings as: (i) below expectations, (ii) development needed, (iii) solid performer, (iv) exceeds expectations, or (v) role model).
[5] Canales's affidavit provides no similar information regarding any performance evaluations of White assistant managers of whom the parties agree there were at least two, Rosa and Sackowicz.

supervisors[] to clean the Racquet Ball Room." *Id.* Rine testified that he directed all employees to clean portions of the store and that he cleaned areas of the store on occasion. *See* ECF No. 93-21 at 66–67.

### 4.   Distribution of Other Responsibilities and Resources

John contends that Rine assigned him and other Black assistant managers a higher workload and gave them fewer resources to complete those assignments. Murillo avers that Rine "load[ed] up" John with more assignments compared to Rosa and Sackowicz. ECF No. 93-33 at 3. He also avers that John and Simon were routinely provided with fewer associates to complete tasks than Rosa and Sackowicz. *Id.* at 4. Franklin similarly avers that "Mark Sackowicz and Mike Rosa had a full complement of staff of [a]pproximately 20 associates each night, while Jean Simon and Mr. John had a reduced staff of approximately eight associates each night to complete their notes/assignments." ECF No. 93-31 at 6. In addition, John avers that Rine "ordered Jean Simon and [him] to remain on duty to complete all our tasks, two to three hours past the end of our shifts, while Mark Sackowicz and Mike Rosa were allowed to leave promptly at 8:00 am, regardless of what stage of their tasks remained incomplete." ECF No. 93-28 at 3. Rine denied that John's and Simon's assignments increased after he arrived at the store. ECF No. 93-21 at 43.

### 5.   Schedule Accommodations

Wal-Mart assistant managers are staffed to fill one of three shifts on any given day: the opening shift (8:00 a.m. to 6:00 p.m.), the closing shift (12:00 p.m. to 10:00 p.m.), and the overnight shift (10:00 p.m. to 8:00 a.m.). ECF No. 82 at 3. On January 14, 2019, John emailed

Human Resources Manager Lauri Canales requesting a modified schedule of 9:00 a.m. to 7:00 p.m. to accommodate his childcare responsibilities.[6]  *Id.*

At this point, the parties' stories diverge.  Wal-Mart contends that the next day Canales informed John that while the company could not grant him a permanent accommodation, it would grant him a modified schedule for two-weeks while he made alternative childcare arrangements.  *Id*; ECF No. 93-12 at 2 (email from Canales granting John a two-week accommodation).  Canales testified that Wal-Mart does not grant such accommodations on a permanent basis.  *See* ECF No. 93-22 at 13.  John contends that Wal-Mart granted him the accommodation on a longer-term basis.  *See* ECF No. 81-1 at 12 (John testifying that he worked the accommodated schedule for "seven, eight months").  He further contends that shortly after the incident in which Rine instructed John to clean the managers' workstation on his knees, Rine revoked his schedule accommodation.  *Id.* at 11–12; ECF No. 93-28 at 9.  John also contends that Rine granted schedule accommodations to Sackowicz and Rosa.  *See, e.g.*, ECF No. 93-32 at 7.

### 6.    Store "Tours"

Store managers at Wal-Mart conduct "tours" of stores in the morning with assistant managers.  ECF No. 93-28 at 3.  During the tours, the store manager provides the assistant managers with feedback regarding completed assignments.  *Id.*  John avers that "[a]fter James Rine arrived at the Stratford store, he stopped touring the store with Jean Simon and I, and did all his morning tours with Mark Sackowicz and Mike Rosa."  *Id.*; *see also* ECF No. 93-31 at 5 ("After Mark Sackowicz and Mike Rosa arrived at Stratford, James Rhine conducted his tours

---

[6] John contends that he "was initially approached by Rine" concerning the revised schedule, ECF No. 93-1 at 25, but he does not cite any evidence in support of this assertion.

with them exclusively, and never toured with Mr. John or Mr. Simon.").  John avers that because Rine did not go on tours with him and Simon, they "were unable to get the store manager's feedback on any needed improvements or changes with respect to our completed assignments." ECF No. 93-28 at 3.  Rine testified that he conducted tours with "everybody."  ECF No. 93-21 at 62.

### 7.      Requests to Transfer

Wal-Mart has a policy that employees with annual performance ratings of development needed are not permitted to transfer to other Wal-Mart stores.  *See* ECF No. 93-21 at 19.  After Rine arrived at the Stratford store, John made four requests to transfer to other Wal-Mart stores, each of which was rejected.  ECF No. 93-26 at 9.

According to Beasley, when Charlie Bryant, a White male, complained of his development needed rating, Canales changed his rating to solid performer and subsequently approved his request to transfer to another store.  ECF No. 93-32 at 6.  Canales remembers a different version of events.  She testified:

> [T]he situation was [Bryant] was an external hire who was struggling in a high volume store so we made a decision based on business needs to put him in a lower volume store so he was able to learn the role of an assistant manager. . . .  Charlie did not request a transfer, that was a decision the market manager and I made based upon business needs . . .

ECF No. 93-22 at 36.

In addition, Beasley avers that Bridgett Cremlin, a White woman, was also allowed to transfer to another Wal-Mart store in the area.  ECF No. 93-32 at 6.  And he avers that Melissa Rivera, a White woman, was fired from the Stratford store but was later rehired "and was immediately sent to work" by Canales at the Waterbury Wal-Mart location.  *Id.*

### 8.      Pepsi Vendor Incident

In January 2019, Wal-Mart's outside Pepsi vendor visited the Stratford store to inquire about "put[ting] additional features in electronics."  ECF No. 93-21 at 49; ECF No. 81-5 at 34. Before leaving the store, the vendor offered John a few cans of energy drinks, and John accepted. ECF No. 81-1 at 6.  Wal-Mart had a conflict-of-interest policy, which provided that associates and managers "are not allowed to take gratuities whether it be drinks, shirts, those kinds of things" from outside vendors.  ECF No. 93-21 at 49; *see also* ECF No. 93-19 at 9 (Wal-Mart employee policies indicating that "[a]ccepting gifts and entertainment can cause a conflict, or the appearance of a conflict, between personal interests and professional responsibility.  Walmart's culture is to never accept gifts or entertainment from any supplier, potential supplier, government agent or other third party the associate has reason to believe may be seeking to influence business decisions or transactions.").  Believing that John had violated this policy by accepting the drinks, Rine reported the incident to Wal-Mart's ethics team.  *See* ECF No. 81-2 at 2–5.  The ethics team conducted an investigation, which included a review of security camera footage, and found that the allegation against John was substantiated.  *Id.*  John went on leave from the company for medical reasons before any disciplinary action was taken against him and "never actually came back."  ECF No. 81-1 at 7–8; *see also* ECF No. 93-28 at 14; ECF No. 93-10 at 2 (attaching form signed by clinical psychologist stating that John suffered from "elevated anxiety, hypertension, sleep disturbance, excessive worry and agitation major depression . . . job stress and harassment, and inability to perform to duties").

In John's telling of this incident, he informed Beasley, an asset protection manager, that he accepted the drinks from the vendor.  *See* ECF No. 93-4 at 2.  In addition, he contends that Rine violated the same policy by accepting several cases of energy drinks from an outside

vendor.  *Id.*  Rine responds that those energy drinks were provided by Wal-Mart for associates at all Wal-Mart stores during the Black Friday season.  ECF No. 93-21 at 50; *see also* ECF No. 93-22 at 19 (Canales testifying that the energy drinks in question "were sent in for the entire company for the Thanksgiving Day/Black Friday event to all the stores in the company").  Charles Keeler, a former asset protection associate at Wal-Mart, contends that "[t]here was no company-wide Asset Protection policy, nor one in Market Area 173, permitting acceptance of Red Bull Energy Drinks from any vendor to distribute to associates.  This was not a practice in all the years I worked for Walmart in Asset Protection."  ECF No. 93-34 at 5.

### 9.    Derogatory Remarks

John contends that Rine and other Wal-Mart employees made several racially derogatory comments.  John was not present for any of these statements.  ECF No. 81-1 at 14 ("Q.  Okay.  Did you ever personally hear Mr. Rine use any racial slurs?  A.  I can't—myself did I hear him, no.  Are there rumors and stuff floating around . . . from other people, yes, I've heard that.").  He relies on the affidavits of his former co-workers to support these contentions.

In one instance, a customer stole jewelry from the Stratford store's jewelry department.  ECF No. 93-32 at 8.  After Mr. Rine arrived on the scene, Beasely avers that Rine said "I bet they were Black and came from Bridgeport."  *Id.*  In another instance, Rine's niece, who is White, was shopping at the Stratford store.  *Id.*  Rine did not speak with her while she was at the store.  When asked why he did not speak to his niece, Beasley avers that Rine stated he "wouldn't speak to her because she dated a Black guy, so she was now spoiled forever."  *Id.*  In addition, Keeler avers that Rine instructed him to review video surveillance of an office to check whether Beasley, who is Black, and

Bien-Aime, who is White, were in the office for a long time together, because he suspected they were sleeping together.  ECF No. 93-34 at 5.  Keeler avers that Rine told him that he "would be very upset if it were discovered that they were sleeping together, because the thought of Robin sleeping with a Black guy would be devastating."[7]  *Id.*  Finally, Keeler avers that around Christmas 2017, Geloso stated that "we ought to have black Christmas trees, because they would sell better in this store."  ECF No. 93-34 at 3.

### C.    Procedural History

John filed his initial complaint on September 27, 2021, ECF No. 1, and the operative complaint on March 9, 2022, ECF No. 24.  Wal-Mart filed a motion to dismiss on March 30, 2022, ECF No. 28, which I granted as to all claims except John's hostile work environment claim and his negligent hiring, supervision, and retention claim, ECF No. 68.  Wal-Mart filed the pending motion for summary judgment and its Local Rule 56(a)(1) statement on July 3, 2023.

---

[7] John suggests that Rine made three other racially derogatory statements.  He asserts that Rine "was accused of referring to an employee as a [N-word]."  ECF No. 93 at 24.  He also suggests that Rine wrote "I hate Haitians" on a whiteboard in a training room.  *Id.* at 10.  And Beasley avers that Rine refused to give him keys to the Stratford building because he was afraid that Beasley would rob the store because he is Black.  ECF No. 93-32 at 4.  None of these assertions is supported by admissible evidence.  As an initial matter, John does not assert that Rine used the N-word, just that he was "accused" of using it.  John offers no evidence that Rine actually used that derogatory term.  For his part, Rine denies using the term.  ECF No. 93-21 at 44.  Similarly, John provides no evidence that Rine wrote "I hate Haitians" on the whiteboard.  Moreover, this accusation against Rine was investigated by Canales as well as Wal-Mart's Regional Human Resources Team, Regional Asset Protection Team, and Home Office Ethics Team, and each of these investigations found the allegation to be unsubstantiated.  ECF No. 82 at 4.  Because these accusations are unsubstantiated, I will disregard them.  *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (in opposing a motion for summary judgment, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation.").  Finally, Beasley avers that Rine told Bien-Aime who then told him that "[Rine] did not want to give [Beasley] keys because [he] was Black, and [Rine] was afraid [he] would rob the store and then erase the surveillance tapes."  ECF No. 93-32 at 4.  This is inadmissible hearsay because there is insufficient evidence to suggest that the report of what Rine said was made within the scope of Bien-Aime's employment, *see* Fed. R. Evid. 801(d)(2)(D); as such it is not admissible.  *See, e.g.*, *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (holding that the nonmoving party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial.").  Thus, I will also disregard this assertion.

*See* ECF No. 78; ECF No. 79; ECF No. 80.  John filed his response and his Local Rule 56(a)(2) statement on September 3, 2023.[8]  ECF No. 93.  Wal-Mart filed a reply on February 9, 2024.

## II.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party

---

[8] Plaintiff's counsel filed several motions for extension of time to file his response to Wal-Mart's motion for summary judgment. *See* ECF No. 83; ECF No. 85; ECF No. 87; ECF No. 89; ECF No. 91.  I denied his final motion for extension of time because I found that "Plaintiff's counsel failed to take reasonable measures to comply with court-ordered deadlines even after the Court granted multiple extensions."  ECF No. 92.  John filed his response nearly three weeks after I denied his motion for extension of time, and he subsequently filed a "Nunc Pro Tunc Application for Acceptance of Plaintiff's Opposition," ECF No. 94, as well as a motion for leave to file excess pages, ECF No. 95.  "Although it may seem harsh to penalize a client for the conduct of his counsel, the Supreme Court has instructed that such consideration is not appropriate, as clients are accountable for the acts of their attorneys." *Jones v. E. Hartford Police Dep't*, No. 3:13-CV-01007, 2016 WL 1273170, at *7 (D. Conn. Mar. 31, 2016) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993)).  Nevertheless, out of concern for John's rights as a litigant, I will grant his motion to file his response *nunc pro tunc*. *See Philbrick v. University of Connecticut*, 51 F. Supp. 2d 164, 166 (D. Conn. 1999) (granting the plaintiff's motion for reconsideration of the Court's dismissal on the grounds that plaintiff's counsel's failure to oppose the defendant's motion to dismiss was inadvertent and noting that "[t]he Court's decision today reflects its recognition that the legal rights of litigants should not be impaired due to ineffectual lawyering").  I also grant Plaintiff's counsel's motion to file an oversize brief, which he filed five days *after* he had filed an 81-page brief (more than double the page limit in Local Rule 7) consisting of highly repetitive recitations of the relevant facts and law.  For that blatant failure to follow this Court's rules—one that foisted on them unnecessary burden and expense in connection with preparing a reply brief—I issue a separate order today requiring Plaintiff's counsel to show cause why he should not be sanctioned.

carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## III.    DISCUSSION

### A.    Hostile Work Environment

John alleges in his complaint that Wal-Mart maintained a "severe and pervasively hostile work environment" in violation of Title VII of the Civil Rights Act of 1964. ECF No. 24 at ¶ 116. A hostile work environment claim requires the plaintiff to show "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted). The plaintiff must also show that the harassment occurred because of his race and/or color. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic.").

#### 1.    Severity and Pervasiveness

To satisfy the first requirement, a plaintiff must demonstrate "that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano*, 294 F.3d at 373-74. "This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to

create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* at 374 (internal quotation marks omitted). As a general rule, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*

There is no dispute that John subjectively perceived his work environment to be abusive. He avers that he "believe[s] the overall culture at the Walmart district/area/ region was one of hostility towards African Americans, as compared to similarly situated White employees," ECF No. 93-28 at 2, that he "was specifically targeted for termination based on his race by James Rine," *id.*, and that work-related stress and anxiety forced him to resign, *see* ECF No. 93-28 at 14.

Thus, to survive summary judgment on this claim, John must present evidence introducing a genuine factual dispute as to whether his work environment was objectively hostile. John points to instances of Rine's and other managers' allegedly discriminatory conduct to argue that the Stratford store constituted an objectively hostile work environment. Specifically, he argues he was subjected to a hostile work environment on the basis of his race because, according to John: (1) Rine gave him unfavorable performance ratings; (2) Rine ordered him to perform the menial task of cleaning areas of the store while not asking the same of his White colleagues and in one instance publicly ordered John to clean an area "on his knees"; (3) Rine treated White colleagues more favorably than him and other Black colleagues, giving Black assistant managers a disproportionate amount of work with fewer resources, granting scheduling accommodations only to White assistant managers, conducting store "tours" exclusively with White assistant managers, and allowing White assistant managers to transfer to other stores; (4)

John was improperly investigated for violating Wal-Mart's policy concerning outside vendors; and (5) Rine and others made racially derogatory statements.

Many of these allegations fail to support a claim for hostile work environment.  As an initial matter, several of John's allegations share a flaw: John was not present for the incidents, nor was he aware of them at the time he worked at the Stratford store.  John cites the affidavit of Andy Murillo as evidence that Rine ordered other Black associates to clean various areas of the store.  *See* ECF No. 93 at 54, 64; ECF No. 93-33 at 6.  But there is no indication in the record that John was aware of these incidents when he worked at the Stratford store.  John also relies on the affidavits of former co-workers to support his claim that Rine made racially derogatory remarks, but John was not present for any of these statements.  *See* ECF No. 81-1 at 14 ("Q. Okay.  Did you ever personally hear Mr. Rine use any racial slurs?  A.  I can't—myself did I hear him, no.  Are there rumors and stuff floating around . . . from other people, yes, I've heard that.").  When asked which derogatory statements he had heard through "rumors," John recalled only two: one in which Rine stated that his niece was "wasted forever" because she was dating a Black man and another in which Rine predicted that a customer who had stolen jewelry was Black.  *Id.* at 14–16.  Similarly, there is no evidence in the record to suggest that John was aware that Michael Geloso said that "we ought to have black Christmas trees, because they would sell better in this store."  ECF No. 93-34 at 3.

In *Leibovitz v. New York City Transit Authority*, the Second Circuit held that "Title VII's prohibition against hostile work environment discrimination affords no claim to a person who experiences it by hearsay."  252 F.3d 179, 182 (2d Cir. 2001).  While the Second Circuit acknowledged that "evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination," *id.* at 190, for such evidence

to be relevant, a plaintiff must demonstrate that the "harassment adversely affected the terms and conditions of *her own* employment." *Id.* at 189 (emphasis added). So a plaintiff bringing a hostile work environment claim must support her claim with evidence of harassment "of which she was aware during the time that she was allegedly subject to a hostile work environment." *P.F. v. Delta Air Lines, Inc.*, No. 99-CV-4127, 2000 WL 1034623, at *5 (E.D.N.Y. June 20, 2000) ("A plaintiff who did not know of the sexual acts directed at co-workers during the time in which she claims to have experienced a hostile work environment cannot assert them as a basis for believing her general work environment was so abusive as to effectively alter her working conditions.") (internal quotation marks omitted). Evidence of discriminatory conduct of which John was unaware while he worked at the Stratford store cannot contribute to his hostile work environment claim.

In addition, some of John's contentions are not supported by admissible evidence. John argues that Rine's unfavorable performance evaluations were part of a "scheme" to replace him, Beasley, and Simon with two White assistant managers, Rosa and Sackowicz. *See, e.g.*, ECF No. 93 at 9, 13. But John does not support this assertion with any admissible evidence. *See* ECF No. 93-29 at 3 (affidavit of John offering the hearsay statement that "[i]n or around late 2016, shortly after James Rine became the store manager at Stratford Walmart, he told Ms. Bien-Amie that 'he planned to bring two of his assistant managers from Wallingford[, the store he left], to work in the Stratford Walmart store. Ms. Bien-Amie later told Derrick Beasley, Jean Simon, and I that James Rine intended to bring[] Mark Sackowicz and Mike Rosa (both White men), his former assistant managers from Wallingford's Walmart to replace Jean Simon and I, as assistant managers'" (second alteration in original)); ECF No. 93-33 at 7 (affidavit of Andy Murillo offering the hearsay statement that "[a] month after Mark Sackowicz and Mike Rosa transferred

from the Wallingford store, they both told me that James R[]ine brought them to the Stratford store, because he intended to fire Jean Simon and Jayakar John"); ECF No. 93-34 at 4 (affidavit of Keeler asserting without personal knowledge that "[w]hen James Rine went to the Stratford store, he brought Mark Sackowicz, . . . and Mike Rosa, specifically to replace Jay John, Derrick Beasley and Jean Simon . . . "). In the absence of admissible evidence regarding this assertion, I must disregard it. *See Raskin v. the Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); *Ezeh v. McDonald*, No. 6:13-CV-6563, 2015 WL 13951087, at *1 (W.D.N.Y. May 20, 2015) ("On a motion for summary judgment, factual assertions that are not supported by admissible evidence must be disregarded.").

Moreover, the record indicates that Rine gave performance evaluations in a race neutral manner. He rated other Black assistant managers "solid performers" and non-Black assistant managers as "development needed." ECF No. 82 at 2. Further, John had been rated "development needed" by another store manager two years before Rine transferred to the Stratford store. ECF No. 81-5 at 17–18. In the absence of any admissible evidence that John's performance evaluations were motivated by racial animus, they cannot contribute to his hostile work environment claim. *See Alfano*, 294 F.3d at 378 (holding that factoring facially neutral incidents into the "totality of circumstances" "requires some circumstantial or other basis for inferring that incidents [neutral] on their face were in fact discriminatory"); *Jarnutowski v. Pratt & Whitney*, 103 F. Supp. 225, 239 (D. Conn. 2015) ("It is well-settled that a plaintiff may disagree with his employer about the assessments of his performance, but that does not, in turn, raise a triable issue of fact with respect to pretext.").

Wal-Mart's investigation of John following the Pepsi vendor incident also does not support the hostile work environment claim.  John argues that Rine's reporting him for accepting energy drinks from an outside vendor is further evidence of his harassing behavior.  *See* ECF No. 93 at 29–32.  But John admits to accepting the drinks, ECF No. 81-1 at 6, and Wal-Mart had a policy prohibiting employees from accepting gifts from third parties, ECF No. 93-21 at 49 (Rine testifying that Wal-Mart associates and managers "are not allowed to take gratuities whether it be drinks, shirts, those kinds of things" from outside vendors); *see also* ECF No. 93-19 at 9 (Wal-Mart employee policies indicating that "[a]ccepting gifts and entertainment can cause a conflict, or the appearance of a conflict, between personal interests and professional responsibility. Walmart's culture is to never accept gifts or entertainment from any supplier, potential supplier, government agent or other third party the associate has reason to believe may be seeking to influence business decisions or transactions.").  Because John admits to violating Wal-Mart policy, this allegation cannot support his hostile work environment claim.  *See Goins v. Bridgeport Hosp.*, No. 3:11-CV-560, 2013 WL 1193227, at *5 (D. Conn. Mar. 25, 2013), *aff'd*, 555 F. App'x 70 (2d Cir. 2014) ("[The plaintiff's] warranted disciplinary actions for workplace violations do not create a hostile work environment."); *see also Crews v. City of Ithaca*, No. 3:17-CV-213, 2021 WL 257120, at *11 (N.D.N.Y. Jan. 26, 2021), *aff'd*, No. 21-217-CV, 2022 WL 1493762 (2d Cir. May 12, 2022) (holding that the plaintiff's argument that "her repeated discipline constitutes sufficiently severe and pervasive conduct" did not support her hostile work environment claim because "Plaintiff admitted to the conduct underlying most—if not all—of the violations alleged in the notices of discipline.  Thus, Defendants were investigating and acting on legitimate concerns of misconduct on the part of an employee.  Such action does not create a hostile work environment.").

John argues that Rine himself violated the same policy by accepting energy drinks from an outside vendor.  But this argument fails because, as John's supervisor, Rine is not similarly situated to him.  *See Robertson v. Wells Fargo Bank, N.A.*, No. 3:14-CV-01861, 2017 WL 326317, at *9 (D. Conn. Jan. 23, 2017) ("A supervisor and a subordinate are nearly rarely similarly situated . . . .  This principle is particularly true where the conduct at issue is conduct over which the supervisor had oversight.  Where a supervisor is charged with the responsibility of managing their subordinate consistent with the employer's policies and procedures, their responsibilities diverge."); *see also Shaw v. McHugh*, No. 12-CV-6834, 2015 WL 1400069, at *9 (S.D.N.Y. Mar. 26, 2015), *aff'd*, 641 F. App'x 95 (2d Cir. 2016) ("[S]upervisors are generally not considered materially similar to supervisees.").  In addition, John argues that he informed Beasley, an asset protection manager, that he accepted the drinks from the outside vendor, but he does not proffer any evidence that violations of Wal-Mart's policy concerning outside gifts may be excused by informing an asset protection manager of one's acceptance of such a gift.  Thus, the Pepsi vendor incident cannot contribute to John's hostile work environment claim.

Nevertheless, there still is enough evidence in the record for a reasonable jury to find that John experienced an objectively hostile work environment.  John points to evidence that Wal-Mart treated White employees more favorably than him and other Black assistant managers; that Rine ordered him to clean the Racquet Ball Room on "many occasions" from 2017 and 2019, ECF No. 93-31 at 1–2; and that Rine never "order[ed] any White associates or supervisors[] to clean the Racquet Ball Room."  *Id.* at 2.  John also points to evidence that in one instance Rine ordered him in a public setting to clean the managers' workstation "on [his] knees," ECF No. 81-1 at 10, even though the job of cleaning the managers' workstation was customarily done by associates or the maintenance department, ECF No. 93-32 at 7, and even though someone else

had already cleaned the area, ECF No. 81-1 at 9–10.  The record also includes evidence that: (1)

Rine assigned John and another Black assistant manager more work with fewer resources than he

assigned White assistant managers, *see* ECF No. 93-33 at 3–4; ECF No. 93-31 at 6; (2) Rine

revoked his scheduling accommodation while affording scheduling accommodations to Rosa and

Sackowicz,[9] *see* ECF No. 81-1 at 11–12; ECF No. 93-32 at 7; (3) Rine conducted daily store

tours with Rosa and Sackowicz but not John or other Black assistant managers, ECF No. 93-28

at 3; ECF No. 93-31 at 5; and (4) Wal-Mart denied John's transfer requests while permitting a

White assistant manager to transfer to another store,[10] ECF No. 93-26 at 9; ECF No. 93-32 at 6.

Though these incidents are not suggestive of "discrimination, intimidation, ridicule, [or] insult,"

*Alfano*, 294 F.3d at 373–74, they do evidence disparate treatment, which may, together with

other evidence, contribute to a hostile work environment claim.  *See, e.g.*, *Watson v. American*

*Red Cross Blood Servs.*, 468 F. Supp. 2d 484, 488 (W.D.N.Y. 2007) ("[I]ncidents of different

treatment based on race that are related to the terms and conditions of employment . . . can

constitute acts contributing to a hostile work environment."); *Taylor v. CSC Holdings, LLC*, No.

---

[9] While it is true, as Wal-Mart argues, that denying an employee's scheduling accommodation where the employer has a policy of not granting any such accommodations does not by itself suggest discrimination, *see Townsend v. First Student*, No. 21-2901-CV, 2023 WL 1807719, at *1 (2d Cir. Feb. 8, 2023), John submits evidence that Wal-Mart granted two White assistant managers, Rosa and Sackowicz, a scheduling accommodation despite its general policy of not granting such accommodations.  *See* ECF No. 93-32 at 7; *see also* ECF No. 93-22 at 13 (Canales affirming that she informed John that "we do not do accommodations").  As discussed further below, disparate treatment of employees on the basis of a protected characteristic can support a hostile work environment claim.  *See Watson v. American Red Cross Blood Servs.*, 468 F. Supp. 2d 484, 488 (W.D.N.Y. 2007).

[10] John had a development needed rating at the time he made his transfer requests, *see* ECF No. 81-5 at 21–28 (John's performance evaluations for 2017 through 2018 showing his development needed rating), and so Wal-Mart's rejection of his requests was in line with its policy barring employees with development needed ratings from transferring to other stores, *see* ECF No. 93-21 at 19.  However, John points to evidence that Wal-Mart permitted White assistant managers to transfer notwithstanding similar ratings issues.  Specifically, he proffers evidence that when Charlie Bryant, a White assistant manager, complained of his development needed rating, Canales changed his rating to solid performer and subsequently approved his transfer request.  ECF No. 93-32 at 6.  Though John does not proffer evidence that Canales specifically changed Bryant's rating to permit him to transfer, at this stage, I must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Caronia*, 715 F.3d at 427.  As such, I find that Bryant is similarly situated to John even though, technically, he did not have a development needed rating at the time of his transfer.

17-CV-4407, 2019 WL 13412420, at *19 (E.D.N.Y. Sept. 30, 2019) (noting that "disparate treatment and excessive scrutiny" of the plaintiff "contribut[ed] to the hostile work environment").  Here, evidence that Rine consistently treated White assistant managers more favorably than Black assistant managers along with evidence that Rine made racially derogatory remarks regarding Black people—at least some of which John was aware of at the time—is enough to suggest that Rine's actions were motivated by bias.

Taken together, the evidence in the record raises a genuine issue of material fact as to whether the Stratford store constituted a hostile work environment.  When assessing whether conduct amounts to a hostile work environment, courts must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The record here indicates that the alleged incidents of discrimination occurred with considerable frequency.  Rine and John worked together at the Stratford store for less than three years. During that time, Rine conducted daily store tours with Rosa and Sackowicz, while allegedly refusing to do so with John and other Black assistant managers; and Rine ordered John to clean areas of the store on "many occasions," while allegedly exempting John's White counterparts. And among these and other frequent but relatively minor incidents was one that was much more severe and humiliating: Rine ordered John to clean the store managers' area "on [his] knees" before a large group of John's peers even though it was not his responsibility and the area had already been cleaned.  Rine also allegedly made two racially derogatory remarks of which John was aware during the relevant timeframe, purportedly remarking that his niece was "forever wasted" for dating a Black man and presuming that a customer who had stolen jewelry was

Black.  Finally, John submits evidence that Rine's conduct unreasonably interfered with his work performance.  He contends that Rine assigned him a disproportionate workload and provided him with fewer resources than his White colleagues.  Further, he avers that Rine required him and other Black assistant managers to "remain on duty to complete all our tasks, two to three hours past the end of our shifts," while White assistant managers were permitted to leave on time regardless of the status of their assignments.  ECF No. 93-28 at 3.  And John avers that he suffered severe anxiety and stress as a result of his allegedly hostile work environment.  *See* ECF No. 93-10 at 2 (attaching form signed by clinical psychologist stating that John suffered from "elevated anxiety, hypertension, sleep disturbance, excessive worry and agitation major depression . . . job stress and harassment, and inability to perform to duties").  A reasonable jury could find these incidents severe or pervasive enough to create an objectively hostile or abusive work environment.

### 2. Imputing Conduct to Employer

In addition to demonstrating sufficient severity and pervasiveness, John must also show that a "specific basis exists for imputing the objectionable conduct to the employer." *Alfano,* 294 F.3d at 373.  "Objectionable conduct is automatically imputed to the employer where the harasser is the victim's supervisor . . . ." *Delgado v. City of Stamford*, No. 3:11-CV-01735, 2015 WL 6675534, at *24 (D. Conn. Nov. 2, 2015).  Here, Rine was John's direct supervisor, and the vast majority of objectionable conduct is attributable to Rine.  Therefore, his objectionable conduct is imputed automatically to Wal-Mart.

Because John has demonstrated a genuine issue of material fact as to whether he experience a hostile work environment, and because a specific basis exists for imputing the

objectionable conduct to Wal-Mart, I deny Wal-Mart's motion for summary judgment on John's hostile work environment claim.

### B.      Negligent Hiring, Retention, and Supervision

John also brings a claim for negligent hiring, retention, and supervision against Wal-Mart.  "Under Connecticut law, a negligent hiring claim requires a plaintiff to plead and prove that he was injured by the defendant's own negligence in failing to select as its employee a person who was fit and competent to perform the job in question and that his injuries resulted from the employee's unfit or incompetent performance of his work."  *Abate v. Cir.-Wise, Inc.*, 130 F. Supp. 2d 341, 344 (D. Conn. 2001).  A negligent supervision claim requires a plaintiff to establish "that he suffered an injury due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise."  *Id.*  Similarly, a negligent retention claim requires "a plaintiff to prove that during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicate his unfitness and the employer fails to take further action."  *Chylinski v. Bank of America*, 630 F. Supp. 2d 218, 221 (D. Conn. 2009).

"Whether the claim is for negligent hiring, negligent supervision or negligent retention, a plaintiff must allege facts that support the element of for[e]seeability."  *Elbert v. Connecticut Yankee Council, Inc.*, No. CV010456879S, 2004 WL 1832935, at *13 (Conn. Super. Ct. July 16, 2004) (internal footnote omitted).  Wal-Mart argues that it is entitled to summary judgment on this claim because "plaintiff can point to no evidence suggesting Wal-Mart knew or should have known of any propensity on Rine's part to engage in racially harassing behavior."  ECF No. 79 at 18.  But this argument misstates the law and ignores evidence in the record.  It is doubtful that Connecticut law requires proof of constructive or actual knowledge of a supervisor's propensity

to engage in misconduct to establish negligence in this context.  *See Doe v. Saint Francis Hosp.
& Med. Ctr.*, 309 Conn. 146, 172, 72 A.3d 929, 946 (2013) ("It is true that, as a general matter, a
defendant is not responsible for anticipating the intentional misconduct of a third party unless the
defendant knows or has reason to know of the third party's criminal propensity.  The criminal
misconduct of a third party may be foreseeable under the facts of a particular case, however,
without a showing that the defendant had such actual or constructive knowledge of the third
party's criminal propensity. . . .  [W]hen a defendant's conduct creates or increases the risk of a
particular harm and is a substantial factor in causing that harm, or when the defendant otherwise
has a legally cognizable duty to aid or protect another person, the fact that the harm is brought
about by the actions of a third party does not relieve the defendant of liability, ***even though the
third party's conduct is criminal***, if the harm that occurred is within the scope of the risk created
by the defendant's conduct or reasonably could have been anticipated in light of the defendant's
duty to protect." (emphasis in original) (internal citation omitted)).  In any event, John proffers
evidence that Charles Keeler "informed Anthony Williams, Vice President of Asset Protection
that James Rine, Michael Geloso and Lauri Canales were targeting Black Assistants in the
Stratford store, also with the full knowledge of [Market Manager] La'Shion Robinson."  ECF
No. 93-34 at 5.  This evidence is enough to create a triable issue of fact as to whether Wal-Mart
knew or should have known of the allegedly hostile work environment at the Stratford store.
*See, e.g.*, *Brunson v. Bayer Corp.*, 237 F. Supp. 2d 192, 209 (D. Conn. 2002) (denying summary
judgment where "evidence of [a co-worker's] other reported misconduct towards female
employees could establish that [the employer] knew or should have known that [the co-worker]
engaged in tortious conduct with similarities to that allegedly suffered by [the plaintiff]").  As
such, I deny summary judgment on John's negligent hiring, retention, and supervision claim.

## IV.     CONCLUSION

For the foregoing reasons, I deny Wal-Mart's motion for summary judgment.


IT IS SO ORDERED.


                                                                                          /s/
                                                                Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                    March 6, 2024